No. 04-755

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 253

LEN WALLACE,

      Plaintiff and Appellant,

    v.

NORMAN HAYES, MAGTRAC BOLUS
PARTNERSHIP, GERALD HILL, LUCILLE
HILL, JACK HEYNEMAN, JOHN HEYNEMAN,
RODNEY J. HAYES,

      Defendants and Respondents.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
                   In and for the County of Yellowstone, Cause No. DV 2001-882,
                   The Honorable Gregory R. Todd, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Arthur V. Wittich, Wittich Law Firm, Bozeman, Montana

                Bruce F. Fain, Murphy, Kirkpatrick & Fain, PLLP, Billings, Montana

        For Respondent:

                Tom Singer, TTS Civil Trial Attorneys, PLLC, Billings, Montana


                        Submitted on Briefs:  August 30, 2005

                               Decided:  October 18, 2005

Filed:


                               Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Len Wallace (Wallace) appeals from an order of the Thirteenth Judicial District, Yellowstone County, denying his motion to vacate an arbitration award and affirming defendants Rodney and Norman Hayes' (collectively "Hayes") motion to confirm the award. We affirm.

¶2 Wallace raises the following issues on appeal:

¶3 1. Whether the District Court abused its discretion by refusing to vacate the arbitration award due to the arbitrator's alleged violation of Wallace's due process rights.

¶4 2. Whether the District Court abused its discretion by refusing to vacate the arbitration award due to the arbitrator's alleged excess of power in awarding punitive damages.

¶5 3. Whether the District Court abused its discretion in determining that Wallace was liable for $2.5 million in nominal and exemplary damages.

¶6 In addition, Hayes raises the following two counterclaims:

¶7 4. Whether the District Court erred in determining that Wallace timely filed his motion to vacate the arbitration award.

¶8 5. Whether the District Court erred in entering an alleged internally inconsistent and unenforceable judgment.

## PROCEDURAL AND FACTUAL BACKGROUND

¶9 Wallace commenced this action on October 29, 2001, against MagTrac Bolus, a Wyoming limited liability company (hereafter "LLC") in which he was a member, and against six other LLC members: Norman Hayes (Norman), Rodney Hayes, Jack and John

2

Heyneman, and Gerald and Lucille Hill (hereafter collectively "LLC Defendants"). The LLC's primary purpose was to own, develop and market products for radio frequency identification and temperature monitoring of livestock. Wallace's complaint alleged fraud, negligent misrepresentation, and breach of partnership obligations.

¶10 The District Court ordered the parties to arbitrate the dispute on June 18, 2002, pursuant to the LLC's Operating Agreement. The Operating Agreement provided, in part, that "[a]ny controversy, claim or dispute arising out of or relating to this Operating Agreement, or to the interpretation, breach or enforcement thereof, other than a dispute as to the value or method of valuation of the assets of the Company, shall be referred to a single arbitrator . . . ."

¶11 The parties stipulated that Wyoming law would govern the arbitration proceedings. The arbitrator requested that each party submit a position statement no later than seven days before the commencement of proceedings. Wallace submitted his statement on November 12, 2002, outlining seven issues regarding the operations of the LLC. The LLC Defendants submitted their position statements on January 21, 2003. Defendants Hayes' and Hills' statement alleged that "Wallace appropriated the assets of [the] LLC for himself or affiliate, and has prevented the corporation and any of its unit holders from using the assets or doing any business on its behalf." Arbitration proceedings began on January 30, 2003.

¶12 The arbitrator considered the LLC Defendants' claims over Wallace's objection that consideration of the counterclaims violated his due process right to receive adequate notice. The arbitrator held hearings on January 30, February 21, and March 18 of 2003. The arbitrator issued his Decision and Award on July 31, 2003 ("July Award"). The parties

3

received the July Award on August 4, 2003. We summarize relevant portions below:

¶13    Paragraph One:  The arbitrator earlier found that Wallace personally had entered into contracts with Phase IV Engineering, Inc. (Phase IV), a Boulder, Colorado corporation, for the sale and other disposition of LLC assets without the consent of Norman Hayes and against the interests of the LLC.  The arbitrator ordered Wallace to provide copies of all former and current contracts between Wallace or his affiliates and Phase IV for the design, manufacturing, production, marketing, and/or distribution of radio frequency identification products of any kind or description.  The arbitrator ordered Wallace to comply within ten days of receipt of the July Award.

¶14    Paragraph Two: The arbitrator ordered Wallace to account to the LLC and its members for all income and all contributions, loans or expenses received or disbursed by Wallace or his affiliates that derived in any way from written or oral agreements between Wallace and Phase IV that pertain to the intellectual concepts and properties identified in the LLC's patents.  The arbitrator ordered Wallace to comply within 30 days from the date of the July Award.

¶15    Paragraph Three: The arbitrator ordered Wallace to assign all contractual rights and interests referenced in paragraph two to the LLC within 30 days from the date of the July Award.

¶16    Paragraph Four: The arbitrator provided that in the event Wallace breached his obligations under paragraphs one, two or three, he would be required to pay nominal and exemplary damages in the amount of $2.5 million for his intentional misappropriation and conversion of property rights belonging to the LLC.  The arbitrator ordered that the money

4

first go to any debts and liabilities of the LLC and then be distributed to the remaining LLC members in proportion to their ownership interest.

¶17    Paragraph Eleven: The arbitrator ordered Norman to pay Wallace $100,000, together with all costs and fees incurred by Wallace, including reasonable attorney's fees, within thirty days of the July Award. The arbitrator further ordered that if Norman breached this obligation, he would be required to transfer 2,500 non-voting units in the LLC to Wallace.

¶18    Wallace applied for a modification of the July Award on August 13, 2003. The arbitrator issued an Order Granting Stay of Further Proceedings on August 18, 2003 ("August Stay"), in which he stayed all of the above obligations from the July Award. The arbitrator issued an Order Modifying Stay Order on September 30, 2003 ("September Order"), in which he lifted the stay on Wallace's obligations under paragraphs one, two and three of the July Award. The arbitrator also ordered Wallace to comply with those paragraphs within twenty days of the September Order, and added the requirement that Wallace provide a verified written accounting of all dealings with Phase IV. In response, Wallace produced one contract on October 17, 2003, but asserted that "there are no agreements to assign, or income and expenses to account for."

¶19    Norman attempted to comply with paragraph eleven of the July Award, despite the arbitrator's stay of that obligation in the August Stay. Norman transferred three demand notes to Wallace on October 30, 2003, with a total value of $150,000 to cover the $100,000 obligation from paragraph eleven of the July Award as well as Wallace's attorney's fees.

¶20    The LLC Defendants moved the District Court to confirm the July Award. Meanwhile, the arbitrator issued his Final Report and Order on December 23, 2003 ("Final

5

Order"). Wallace received the Final Order on December 29, 2003. In the Final Order, the arbitrator determined that Norman's transfer of three demand notes to Wallace did not comply with paragraph eleven of the July Award because the demand notes did not qualify as "cash or its equivalent." Norman thus had defaulted on his obligation and the arbitrator therefore ordered him to transfer 2,500 non-voting units to Wallace. This transfer would reduce Norman's ownership interest to 275 units, all voting, and increase Wallace's interest to 6,000 units, of which 1,250 are voting. The arbitrator further found that Wallace had defaulted on his obligations under paragraphs one, two and three of the July Award and was thus liable for $2.5 million in nominal and exemplary damages.

¶21 Wallace filed a motion to vacate the arbitration awards on March 23, 2004. The District Court heard that motion, along with the Hayes Defendants' motion to confirm, on April 23, 2004. In the meantime, Wallace settled with the Hill and Heyneman Defendants, leaving only the Hayes Defendants. The court denied Wallace's motion and granted the motion to confirm on May 21, 2004.

¶22 The District Court entered an Amended Judgment on August 3, 2004, confirming both the July Award and the Final Order. In particular, the Amended Judgment confirmed that Wallace had breached his obligations under paragraphs one, two and three of the July Award and was therefore liable for $2.5 million in nominal and exemplary damages. It furthered ordered Norman to transfer 2,500 non-voting units to Wallace for breach of his obligation to pay Wallace $100,000 under paragraph eleven of the July Award. The Amended Judgment also states, however, that based on transfers of units previously approved by the court, Norman now owns only 275 units, all voting. Wallace appeals from the District

6

Court's denial of his motion to vacate the arbitration award and the Hayes Defendants cross-appeal regarding Norman's default on his obligation to pay Wallace and the timeliness of Wallace's action.

## STANDARD OF REVIEW

¶23    We note at the outset that the parties agreed to arbitrate their disputes regarding the LLC, a Wyoming limited liability corporation, under the laws of Wyoming.  The parties' agreement to have Wyoming law govern the proceedings puts us in the anomalous position of resolving several issues of first impression under Wyoming law.  The Dissent suggests that this anomaly supports a request to certify the questions of law presented here to the Wyoming Supreme Court.  We disagree.  First, Wallace, as the plaintiff here, chose Montana as the forum to vindicate his claims.  As the State's highest court, we have a duty to adjudicate the issues presented to us on appeal.  Art. VII, Sec. 2, Mont. Const.  Moreover, the Wyoming Rules of Appellate Procedure provide that the Wyoming Supreme Court will accept certified questions of law from federal courts and state district courts.  W.R.A.P., 11.01.  The Wyoming rules are silent on whether the court will accept certified questions of law from other state supreme courts.  Any request for certification on these issues thus risks further delay of an already aged case.  We will therefore address the appeal and emphasize that we resolve the issues presented here under our interpretation of Wyoming law.

¶24    The Wyoming Uniform Arbitration Act (WUAA) limits judicial review of arbitration awards.  *Simon v. Teton Bd. of Realtors* (Wyo. 2000), 4 P.3d 197, 203.  A court may only vacate an award if one of five grounds stated in § 1-36-114 of the WUAA exists.  *DKBP v. Dorr, Bentley & Pecha* (Wyo. 1992), 841 P.2d 811, 816-17.  This section provides, in part,

7

that "(a) [u]pon application of a party the court shall vacate an award where: . . . (iii) the arbitrators exceeded their powers; . . . ." Wyo.Stat. § 1-36-114(a). Our standard in reviewing a court's refusal to vacate an arbitration award is whether the court abused its discretion. *Terra West v. Stu Henkel Realty*, 2000 MT 43, ¶ 22, 298 Mont. 344, ¶ 22, 996 P.2d 866, ¶ 22 (citation omitted).

## DISCUSSION

¶25    We will address first the timeliness issue raised by Hayes on cross-appeal, as it potentially could be dispositive of Wallace's issues.

¶26    **Whether the District Court erred in determining that Wallace timely filed his motion to vacate the arbitration award.**

¶27    Hayes contends that Wallace failed to file his motion to vacate within the prescribed 90-day time limit. Hayes argues that the clock began to run on August 4, 2003, the date that the parties received the July Award. Alternatively, Hayes argues that the clock began to run upon the parties' receipt of the August Stay. Hayes asserts that the August Stay could be construed as a modification of the July Award that serves to start the clock anew on receipt. We disagree.

¶28    Section 1-36-114(b) of the WUAA prescribes the time limit for applying to vacate an arbitration award. This section provides, in part, that an application for vacating an award shall be made within 90 days after delivery of a copy of the award to the applicant. Wyo.Stat. § 1-36-114(b). Upon application of a party to confirm, the court shall confirm the award unless grounds are urged for vacating the award within the prescribed time limit. Wyo.Stat. § 1-36-113.

8

¶29     Section 1-36-114(b) plainly states that the 90-day statute of limitations does not begin to run until after a party receives a copy of the arbitration award. Although the parties received the July Award on August 4, 2003, the arbitrator ultimately stayed this award until December 23, 2003, when he issued his Final Order. We agree with the District Court's reasoning that no award that Wallace could seek to vacate existed before December 23, 2003. The parties received the Final Order on December 29, 2003. Thus, Wallace's motion to vacate, filed on March 23, 2004, fell within the 90-day period and the District Court properly considered it. We therefore affirm the District Court's determination that Wallace timely filed his motion to vacate.

¶30     **Whether the District Court abused its discretion by refusing to vacate the arbitration award due to an alleged violation of Wallace's due process rights**.

¶31     Wallace argues that the arbitrator's decision to consider counterclaims presented by the LLC Defendants violated his due process rights. He asserts that the LLC Defendants' late filing of their counterclaims on January 21, 2003, provided inadequate notice, as he first learned of them on the day that arbitration began. Wallace maintains that the District Court abused its discretion by refusing to vacate the award on these grounds.

¶32     Wallace relies on *Pecha v. Smith, Keller & Associates* (Wyo. 1997), 942 P.2d 387, for the assertion that arbitration proceedings cannot be invoked to circumvent basic due process rights, including notice and opportunity to be heard. The facts of *Pecha* differ greatly, however, from the facts here. In *Pecha*, the court refused to enforce an arbitration award against a party to whom no notice of the arbitration had been given and who was not even present at the arbitration proceedings. *Pecha*, 942 P.2d at 389-91.

9

¶33    In contrast, Wallace received notice of the LLC Defendants' arguments on January, 21, 2003, more than one week before arbitration began, wherein they alleged, in part, that "Wallace appropriated the assets of [the] LLC for himself or affiliate, and has prevented the corporation and any of its unit holders from using the assets or doing any business on its behalf." Moreover, the arbitrator continued the proceedings for additional hearings on February 21, 2003, and March 18, 2003, thereby giving Wallace ample time to respond to any counterclaims.

¶34    Notably, Wallace fails to cite any other authority to support his alleged due process violations. Indeed, arbitrators do not conduct their proceedings within the rigid formality of strict rules of law. *T & M Properties v. ZVFK Architects* (Wyo. 1983)*, 661 P.2d 1040, 1043 (citation omitted). The District Court considered Wallace's due process argument and rejected it, noting that the arbitrator limited his authority to the bounds of the Operating Agreement, and that Wallace had in fact received sufficient notice of the counterclaims on January 21, 2003, when the LLC Defendants submitted their position statements. The arbitrator requested position statements no later than seven days before the commencement of proceedings, and the LLC Defendants complied. We cannot say that the District Court abused its discretion in refusing to vacate the arbitration award due to Wallace's claim of due process violations. We therefore affirm the District Court's refusal to vacate on those grounds.

¶35    **Whether the District Court abused its discretion by refusing to vacate the arbitration award due to the arbitrator allegedly exceeding his power in awarding punitive damages.**

10

¶36     Wallace alleges that the arbitrator exceeded his power in awarding $2.5 million in punitive damages. We note that the arbitrator actually awarded $2.5 million in nominal and exemplary damages. We assume that some portion of this $2.5 million award therefore constitutes punitive damages and we limit our discussion in this section to that portion of the award involving punitive damages. The authority of arbitrators to award punitive damages presents an issue of first impression in Wyoming.

¶37     Wallace argues that the arbitrator lacked the authority under Wyoming law to award punitive damages and thus the District Court abused its discretion in failing to vacate the award. Wallace puts forth four arguments why the award of punitive damages was improper in this case: (1) arbitrators lack the power to award punitive damages under Wyoming law; (2) the agreement of the parties did not authorize punitive damages; (3) the arbitrator impermissibly valued the LLC in awarding punitive damages; and (4) the arbitrator failed to make sufficient findings to support the punitive damages award. We reject all four.

**Arbitrator's Power to Award Punitive Damages**.

¶38     We consider carefully the stated policies of Wyoming regarding punitive damages and arbitration in light of this issue being one of first impression in Wyoming. Arbitration is embedded in the public policy of Wyoming and is favored by the Wyoming Supreme Court. *T & M Properties,* 661 P.2d at 1043 (citation omitted). Wyoming recognizes the expanded powers of arbitrators, noting that they are free to fashion forms of relief that could not be ordered by a court in law or equity. *Pecha,* 942 P.2d at 390-91 (citation omitted). Moreover, the Wyoming Supreme Court has expressed its reluctance to disturb an arbitrator's solution to a controversy, even if it differs from the resolution it might have

11

chosen. *Pecha,* 942 P.2d at 391 (citation omitted).

¶39    Wyoming courts have the discretion to award punitive damages in appropriate cases. *See Squaw Mountain Cattle Co. v. Bowen* (Wyo. 1991), 804 P.2d 1292, 1298.  Courts have awarded punitive damages in cases involving outrageous conduct, including intentional torts, and torts involving wilful and wanton misconduct. *Weaver v. Mitchell* (Wyo. 1986), 715 P.2d 1361, 1370 (citations omitted).  Punitive damages in Wyoming serve to condemn publicly some notorious act or inaction, punish the defendant, deter others, and to deter the defendant from repeating the wrongful act in the future.  *Weaver*, 715 P.2d at 1369-70; *Parker v. Artery* (Wyo. 1995), 889 P.2d 520, 525.

¶40    Based on the foregoing considerations, we conclude that Wyoming law permits arbitrators to award punitive damages.  Wyoming law favors arbitration, *T & M Properties*, 661 P.2d at 1043, and arbitrators have broader powers to fashion remedies than do trial courts.  *Pecha,* 942 P.2d at 390-91.  The arbitrator concluded that Wallace intentionally had misappropriated and converted property rights belonging to the LLC.  Trial courts have discretion to award punitive damages in certain actions, including intentional torts of the type that the arbitrator found Wallace to have committed.  *Weaver*, 715 P.2d at 1370.  It follows that arbitrators, with their expanded powers, also possess this discretion.

¶41    Although arbitration awards generally are not public, assessing punitive damages in arbitration disputes also can accomplish the remaining stated policies of condemning notorious action, punishing the defendant, and serving as a deterrent.  Moreover, § 1-36-114(v) of the WUAA, which discusses grounds for vacating arbitration awards, provides, in part, that "[t]he fact that the relief was such that it could not or would not be granted by a

12

court of law or equity is not a ground for vacating or refusing to confirm the award." Thus, even if punitive damages were not available for intentional tort actions in trial courts, the WUAA suggests that they would be permissible in arbitration awards.

¶42 Wallace argues that by recognizing the power of arbitrators to award punitive damages, we would be opening the door to arbitrators potentially awarding "$25 billion in punitive damage, without judicial review or justification." Such an unfounded assertion finds no support. Courts still must review arbitration awards, and courts must vacate an arbitration award if any of the enumerated reasons in § 1-36-114 of the WUAA exist, including an arbitrator acting in excess of his or her power. Thus, we find untenable the suggestion that a reviewing court would be powerless in the face of an excessive punitive damage award.

**Agreement of Parties**.

¶43 Wallace next contends that nothing in the Operating Agreement, the original complaint, the District Court's order to submit the matter to arbitration, or the position statements of the parties allowed for or requested an award of punitive damages against Wallace. The Operating Agreement's provision on arbitration is very broad. It provides for binding arbitration of "[a]ny controversy, claim or dispute arising out of or relating to this Operating Agreement, or to the interpretation, breach or enforcement thereof, other than a dispute as to the value or method of valuation of the assets of the Company . . . ." The Operating Agreement does not, as Wallace points out, specifically authorize the imposition of punitive damages. More to the point, however, the Operating Agreement does not specifically authorize *any* remedies. Thus, Wallace asserts the novel proposition that the

13

Operating Agreement's silence as to *any* remedies somehow excludes punitive damages while leaving open all other remedies. We disagree and note that under Wyoming law, "arbitrators are free to fashion forms of relief which could not be ordered by a court in law or equity." *Pecha*, 942 P.2d at 390-91.

**Valuation of the LLC**.

¶44 Wallace further asserts that the arbitrator's award of punitive damages constitutes an impermissible valuation of the LLC. He maintains that the Operating Agreement specifically prohibits arbitration on "any dispute as to the value or method of valuation of the assets of the Company." Wallace concomitantly maintains that the arbitration award is vague and discloses no basis as to the determination of the punitive damage amount, and that the arbitrator "clearly" based this amount on an impermissible valuation of the LLC. The District Court dismissed this impermissible valuation claim as "pure conjecture." Wallace once again fails to point to any concrete evidence that would suggest otherwise, and we cannot say that the District Court abused its discretion in concluding that the arbitrator did not impermissibly value the LLC in making the punitive damage award.

**Sufficiency of Findings**.

¶45 Finally, Wallace argues that even if the arbitrator had the authority to award punitive damages, he failed to make sufficient findings to support such an award. Wallace asserts that Wyoming law required the arbitrator to address the punitive damages factors adopted in *Farmers Ins. Exchange v. Shirley* (Wyo. 1998), 958 P.2d 1040. We disagree.

¶46 In *Shirley*, the Wyoming Supreme Court adopted seven factors to consider when awarding punitive damages. *Shirley*, 958 P.2d at 1052-53. These factors are meant to serve,

14

however, as a guide for instructing *juries* on punitive damages awards. *Shirley*, 958 P.2d at 1052. Nothing in the *Shirley* opinion states that these factors must be satisfied with sufficient findings in order to support an award of punitive damages by a court or arbitrator. *Shirley*, 958 P.2d 1040.

¶47 Moreover, the District Court determined that sufficient findings supported the arbitrator's punitive damage award. The court noted that the arbitrator specifically based the punitive damage award on Wallace's intentional misappropriation and conversion of property rights belonging to the company. Wyoming law permits awards of punitive damages for intentional torts. *Weaver*, 715 P.2d at 1370. We thus determine that the District Court did not abuse its discretion in determining that sufficient findings supported the arbitrator's award of punitive damages.

¶48 **Whether the District Court abused its discretion by determining that Wallace was liable for $2.5 million in nominal and exemplary damages.**

¶49 Wallace asserts that the District Court abused its discretion in entering judgment against him for $2.5 million in nominal and exemplary damages. The arbitrator conditioned the award on Wallace's failure to comply with paragraphs one, two or three of the July Award. Wallace maintains that he complied with paragraph one, and that he is unable to comply with paragraphs two and three because no agreements exist with Phase IV that pertain to the intellectual concepts and property of the LLC.

¶50 The September Order directed Wallace to comply with the requirements of paragraphs one, two and three of the July Award by providing the arbitrator and the parties with copies of various contracts. The arbitrator required Wallace to provide a verified written accounting

15

of all income received or distributed by Wallace or his affiliates that he had derived from agreements with Phase IV that pertained to intellectual concepts and properties of the LLC. The arbitrator ordered Wallace to provide this information within twenty days of the September Order. Subsequently, in the Final Order of December 23, 2003, the arbitrator found that Wallace "has failed to provide a *verified written* accounting to the LLC and its members for funds, documents and benefits derived from his relationship with Phase IV Engineering, Inc., in accordance with paragraphs 1, 2 and 3 of the [July Award], as modified by the Arbitrator on September 30, 2003, and Mr. Wallace is in default of those obligations."

¶51     The District Court determined that, aside from merely alleging compliance, Wallace failed to offer any evidence refuting the Final Order's finding that he had defaulted on his obligations under paragraphs one, two and three of the July Award. Wallace counters on appeal by asserting that on January 12, 2004, he timely provided a verified written accounting and assignment of all subsequent contracts into which he had entered. He further asserts that he first brought the assignments to the court's attention on January 15, 2004, and again on June 3, 2004, and June 24, 2004.

¶52     Even assuming these allegations are true, which we do not suggest, the arbitrator required Wallace to comply with paragraphs one, two and three of the July Award within twenty days of the September Order. The arbitrator issued the September Order on September 30, 2003. The deadline to comply fell on October 20, 2003. Therefore, Wallace's alleged verified written accounting of January, 12, 2004, came more than 80 days after the October 20, 2003, deadline to comply. Given these facts, we conclude that the

16

District Court did not abuse its discretion in determining that Wallace had defaulted on his obligations, and thus was liable for $2.5 million in nominal and exemplary damages ordered by the arbitrator.

¶53   **Whether the District Court erred in entering an alleged internally inconsistent and unenforceable judgment.**

¶54    Hayes initially argues that Norman did not default on his obligation to Wallace from paragraph eleven of the July Award, because the arbitrator had stayed that obligation until the Final Order--the same order that found him in default.  Norman attempted to comply on October 30, 2003, by providing Wallace with three demand notes worth $150,000.  The arbitrator found this attempt at compliance wanting because the demand notes did not qualify as "cash or its equivalent," and the District Court agreed.  Hayes' request to remand the case to resolve the issue of his compliance goes beyond the WUAA's permissible limits to correct an award for an evident miscalculation or other error not affecting the merits.  *See* Wyo.Stat. §§ 1-36-111, 115.  We therefore refuse to remand for further litigation or arbitration on this issue.

¶55    Hayes further alleges on cross-appeal that the judgment contains an internal inconsistency that renders it unenforceable.  Specifically, Hayes alleges that paragraph three of the Amended Judgment, which requires Norman to transfer 2,500 non-voting units in the LLC to Wallace, cannot be reconciled with paragraph thirteen.  Paragraph thirteen provides that, as a result of transfers of units previously approved by the court, Norman owns only 275 units, all voting.  Any ambiguities or inconsistencies in the Amended Judgment do not render it unenforceable.

17

¶56 We provide a summary of the arbitrator's findings on the relative ownership interests in the LLC in order to clarify the interests of the respective owners. In the July Award, the arbitrator determined that Hayes owned 2,775 total units--all voting. He also determined that Wallace owned 3,500 total units--2,250 non-voting units and 1,250 voting units. Paragraph eleven of the July Award ordered Norman to pay Wallace $100,000; a breach of this obligation would require Norman to transfer 2,500 non-voting units to Wallace. This outcome initially appears to be impossible in light of the arbitrator's finding that all of Norman's 2,775 units were voting units. The LLC's Operating Agreement provides, however, that voting rights and/or participation in management may be granted only by a majority vote of the voting members. Thus, as explained by the arbitrator in his Final Order, any transfer of units ordered by the arbitrator would require those units to become non-voting.

¶57 The arbitrator found that Norman had breached his obligation to pay Wallace $100,000 pursuant to paragraph eleven of the July Award, and thus was required to transfer 2,500 non-voting units. The District Court agreed with this finding in paragraph three of the Amended Judgment. Paragraph thirteen of the Amended Judgment is not inconsistent; it merely recites the relative ownership interests *after* the required transfer of 2,500 non-voting units from Norman to Wallace pursuant to paragraph eleven of the July Award. In addition to stating accurately that Norman owns 275 voting units (2,775 minus the 2,500 to be transferred to Wallace), paragraph thirteen of the Amended Judgment also states that Wallace owns 1,250 voting units (consistent with the arbitrator's July Award), and 5,975 non-voting units. These totals correctly state the ownership interests *after* Norman transfers

18

2,500 units to Wallace. Wallace's 5,975 non-voting units result from his initial 2,250 non-voting units, plus the transfer of 2,500 non-voting units from Norman, plus an additional 1,225 non-voting units received from other members of the LLC in April and March of 2004 that occurred outside the arbitration proceedings.

¶58 We thus conclude that the District Court did not enter an inconsistent judgment, and that paragraph thirteen of the Amended Judgment correctly reflects the relative ownership interests in the LLC, after the transfer of shares by Norman to Wallace.

**Conclusion**.

¶59 Courts overturn only reluctantly an arbitrator's resolution to a dispute. *Pecha*, 942 P.2d at 391. The District Court determined that the arbitrator acted within the bounds of the Operating Agreement and within the limits of his power. The parties have failed to convince this Court that the District Court abused its discretion in its application of Wyoming law in confirming the arbitrator's awards.

¶60 We affirm the District Court.

/S/ BRIAN MORRIS

We Concur:


/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

19

Justice James C. Nelson dissents.

¶61    Our Opinion candidly concedes that we are resolving several issues of first impression under our interpretation of Wyoming law. That we have put ourselves in this "anomalous position" is both unfortunate and unnecessary.

¶62    Our decision is unfortunate because our Opinion will have no value except to the parties in this particular case. Our decision cannot serve as binding precedent in Montana because Montana law is not at issue. Worse, our decision will not likely even serve as binding precedent in Wyoming, because it is not a decision rendered by the Wyoming Supreme Court. We have no power to render a decision interpreting the law of a sister jurisdiction that is binding on the courts of that state.

¶63    Our decision is unnecessary because we have a means to give the Wyoming Supreme Court the opportunity to interpret its own law. In so doing, our decision would have precedential value in our sister state and give us the ability to resolve the issues raised herein based on the Wyoming Supreme Court's interpretation of its laws, not on how we think Wyoming's highest Court would rule.

¶64    Specifically, Rule 44, M.R.App.P., empowers this Court to certify questions of law, on our own motion, to the highest court of another state if the pending litigation involves a question to be decided under the law of the other jurisdiction; the answer to the question may be determinative of an issue in the pending litigation; and the question is one for which an answer is not provided by a controlling appellate decision, constitutional provision or statute of the other jurisdiction. Rule 44(b), M.R.App.P.

¶65    Undisputedly, the questions of law presented here qualify under these Rule 44 criteria. As conceded at ¶ 23 of our Opinion, the issues to be resolved here must be decided under Wyoming law; the interpretation of Wyoming law will be determinative of the pending issues; and, as a case of first impression, there is no controlling Wyoming appellate decision or statute which answers the legal questions raised.

¶66    I would certify to the Wyoming Supreme Court, the questions of law implicit in Issues 1 and 2.  With our sister state's interpretation of those questions, I would then resolve the remaining issues raised in this appeal.

¶67    I dissent from our failure to follow this approach.


                                        /S/ JAMES C. NELSON



Justice Patricia O. Cotter and Justice Jim Rice join in the dissent of Justice James C. Nelson.


                                        /S/ PATRICIA O. COTTER
                                        /S/ JIM RICE